**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **TINA M. GREGORY f/k/a Tina Adams Green,** ) | |
| **and** ) | |
| **EDDIE JAMES WELLS, SR., individually and** ) | |
| **as Class Representatives for all others similarly** ) | |
| **situated,** ) | |
| ) | |
| ) | **CIVIL ACTION NUMBER** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | <u>**5:11-CV-00422 MTT**</u> |
| ) | |
| **PREFERRED FINANCIAL SOLUTIONS, INC.**) | |
| **CREDIT CARD RELIEF, INC.;** ) | |
| **THOMAS P. DAKICH** *d/b/a* ) | |
| **DAKICH & ASSOCIATES;** ) | **JURY TRIAL DEMANDED** |
| **RHONDA ROELL-TAYLOR;** ) | |
| **JEFFREY BROOKS;** ) | |
| **LARRY D. WILSON;** ) | |
| **STEVE MLYNSKI;** ) | |
| **DANIEL YUSKA;** ) | |
| **ROD MILLER;** ) | |
| **LAQUETTA PEARSON;** ) | |
| **AND** ) | |
| **JEFF WHITEHEAD,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**FOURTH AMENDED COMPLAINT FOR DAMAGES IN CLASS ACTION**

COME NOW, Plaintiffs TINA M. GREGORY, f/k/a Tina Adams Green, and EDDIE JAMES WELLS, SR. individually and as Class Representatives for all others similarly situated (hereinafter "Plaintiffs"), and file this, their Fourth Amended Complaint For Damages in Class Action pursuant to Fed. R. Civ. P. 23. Plaintiffs' Fourth Amended Complaint addresses the issues raised by Defendants' Motion for A More Definite Statement and this Court's Order of October 21, 2013. Doc. 96, wherein the Court stated:

> Although the Plaintiffs have alleged theories of piercing the corporate veil, alter ego, and joint venture, their allegations do not apprise the Preferred Defendants [Defendants Jeffery Brooks, Credit Card Relief, Thomas P. Dakich, LaQuetta Pearson, Preferred Financial Solutions, and Jeff Whitehead] of which Defendant is alleged to have committed which act. Accordingly, the Plaintiffs shall file an amended complaint no later than **December 9, 2013** that puts the individual and corporate Defendants on notice as to which wrongful acts are alleged to have been committed by each Defendant to the extent possible.

Doc. 96, p. 16.

## Nature of the Action

### 1.

This is a proposed class action brought on behalf of all Georgia resident debtors who have done business with Defendants since July 1, 2003 to the present wherein Defendants engaged in debt adjusting as defined by OCGA §§ 18-5-1 *et seq.* for said Georgia debtors.

### 2.

Defendants Preferred Financial Solutions, Inc. ("PFSI"), Credit Card Relief, Inc. ("CCR"), Thomas P. Dakich, d/b/a Dakich & Associates ("Dakich"), Rhonda Roell-Taylor ("Roell-Taylor"), Jeffrey Brooks ("Brooks"), Larry D. Wilson ("Wilson"), Steve Mlynski ("Mlynski"), Daniel Yuska ("Yuska"), Rod Miller ("Miller"), Jeff Whitehead ("Whitehead") and LaQuetta Pearson ("Pearson") (collectively referred to as "Defendants") are a collection of interrelated entities, partnerships, and/or individuals that collectively conspired together to comprise a debt adjustment services operation targeting financially-troubled consumers, extracting exorbitant fees for worthless services from individuals least able to afford it.

### 3.

This is a consumer class action brought on behalf of individuals subjected to Defendants' violations of the Georgia Debt Adjustment Act, OCGA § 18-5-1, *et seq.* ("GDAA").   The

provisions of the GDAA strictly regulate the business of debt adjusting and specifically limit the charges, fees, contributions, or combinations thereof that debt adjusters may charge to consumers such as the Plaintiffs.  Defendants violated the GDAA by charging its clients fees in excess of those authorized under the GDAA.   In addition, Defendants misrepresented the efficacy their debt settlement program and breached their fiduciary duties to the putative class members by failing to inform them that the program most likely would not be successful.

4.

All the Defendants acted jointly and severally and provided assistance to one another in committing violations of Georgia's Debt Adjustment Act, OCGA §§ 18-5-1 *et seq.* (hereinafter "Act") as alleged herein.

5.

Plaintiffs are pursuing this action under the theory of joint venture due to the Defendants' collectively combining their knowledge, property, labor and capital; and sharing management, personnel, bank accounts, officers, directors and shareholders.

6.

Plaintiffs are also pursuing liability as to Brooks, Wilson, Mlynski, Yuska, and Miller (Owner Defendants) resulting from their direct and personal participation in the design, creation and administration of the business of PFSI and CCR which facilitated the violations of the law that are alleged herein.

7.

The Owner Defendants directly participated in creating, designing and administering the debt adjusting scheme.  They each cooperated together to create a company whose sole purpose was to commit tortious conduct to Georgia residents as well as residents of other states. They

designed a business model that would take advantage of class members and entice them to pay fees that were not permitted by Georgia law and not justified by the services the company promised to perform.

8.

The Owner Defendants each directly participated in the administration of the unlawful plan by performing their specific executive roles in the illegal enterprise.  The Owner Defendants have each subjected themselves to individual liability under the Georgia law as explained in <u>Ga. Cash Am. v. Greene,</u> 318 Ga.App. 355, 367-368 (2012).

9.

Defendants PFSI, CCR, Brooks, Wilson, Mlynski, Yuska and Miller ("PFSI Defendants"), promote themselves in print, *via* the internet, and through the broadcast media as a debt settlement company that can negotiate a settlement of a client's unsecured debt for less than 60% of the amount owed.

10.

The individual defendants are being pursued under a theory of individual liability because they were actively and directly involved in <u>designing, creating and administering</u> the scheme which resulted in the wrongdoing set out in this case.  Moreover they each specifically directed, participated in or cooperated in the tortious conduct as more specifically alleged herein.

11.

Once initial contact is made by a potential client, the PFSI Defendants collected the potential client's financial information, including account numbers for all unsecured debts.  Once said Defendants had this information, they persuaded the debtor/clients that based on their many years of experience, their connections in the credit industry and their financial savvy, that said

Defendants could dramatically lower the client's bills, get the client out of debt in a matter of months and settle their debt for 60% or less.

12.

The individuals targeted by all the Defendants are Georgia's most financially desperate individuals struggling under the crushing weight of what appears to be insurmountable consumer debt. Looking for a miracle, or at least an alternative to avoid the stigma of bankruptcy, these Georgia citizens are most vulnerable to the PFSI Defendants' siren song of virtually instant financial relief.

13.

All the Defendants promoted their Debt Settlement Plan (hereinafter "DSP") which involved the Georgia debtor/clients constructively paying the Defendants through their DSP a 7% enrollment fee, a $49.95 monthly maintenance fee, a 25% settlement fee and a $120.00 Local Participating Program Attorney (hereinafter "LPPA") fee. These fees collectively exceeded the limit for fees allowed to be received under the GDAA. It was through these collective fees that all of the Defendants were paid and benefited financially jointly and separately from the Defendants unlawful common scheme or joint venture. The PFSI Defendants encouraged the debtor/clients to stop paying their creditors and instead directed payments to the DSP trust account orchestrated by the PFSI Defendants and Defendant Dakich to receive the Defendants' fees and for the potential future lump sum settlement of the debtor/clients' unsecured debts.

14.

Defendants' DSP enrollment fee, as set forth in Defendants' "Enrollment Agreement," (Doc. 39, pp. 5-7) was 7% of the client's total debt enrolled in Defendants' DSP. The total debt

enrolled by the debtor/clients was greater than the amounts paid to the creditors which caused this fee alone to exceed the 7.5% fee limit set by the GDAA.

15.

Defendants' DSP maintenance fee, as set forth in Defendants' "Enrollment Agreement," is a flat $49.95 monthly fee charged on top of the aforementioned enrollment fee.

16.

Defendants' DSP "settlement fee" as defined in Defendants' "Enrollment Agreement," as "25% of the amount saved from the amount owed at the time of settlement."

17.

Defendants' LPPA fee, detailed in a separate "Fee Disclosure Agreement," is a single fee of $100.00 or $120.00 allegedly paid to a Georgia licensed attorney for the attorney's review of the client's enrollment forms, a telephone consultation and an engagement letter from the attorney.  Doc. 39, pp. 8-9.  Said Georgia attorney provides no debt adjustment services in the State of Georgia to the debtor/clients in the Defendants' DSP.

18.

The involvement of an attorney licensed in Georgia is a deliberate attempt by the Defendants to avoid the restrictions of Georgia's Debt Adjustment Act by attempting to qualify for the Act's exemption for debt adjustment services "incurred in the practice of law in this state", pursuant to OCGA § 18-5-3.

19.

Defendants' service fee is front-loaded:  Defendants require that the monthly amount calculated by Defendants be applied first towards their LPPA fee, their monthly maintenance fee

and their enrollment fee in the first months of the Agreement before any settlement offers are attempted, much less any debt settlement achieved.

20.

In exchange for its exorbitant combination of fees on top of the Georgia debtor's already crushing debt load, Defendants do nothing of value for the Georgia debtor.  In fact, Defendants offer no specific outline of what they will do for the Georgia debtor, nor do they provide any timeline for completing any task under their DSP beyond the collection of their own fees.

21.

If anything, Defendants exacerbate the debtor's already dire straits.  By advising the debtor to cease payments to her creditors, Defendants place themselves in a superior position to receive all of their fees from the debtor before any action would be taken on the debtor's behalf. Further, Defendants' advice and persuasion places the Georgia debtor in the cross-hairs of multiple debt collection lawsuits, further widening the debtor's financial chasm.

22.

The Georgia Debt Adjustment Act makes clear that the fee that can be charged by a debt adjuster for debt adjustment services is capped at 7.5% of the amount distributed monthly to the debtor's creditors.  See OCGA § 18-5-2.  Further, all funds received from a Georgia debtor must be disbursed to the appropriate creditors, less any fees authorized by the Act, within 30 days of receipt of such funds.  See OCGA § 18-5-3.2.   There is no element of intent associated with the violation of the Act.

23.

Thus, the debt settlement services Defendants provide and continue to provide to their Georgia clients are in direct violation of Georgia law and in no way comport with the Act.

## The Parties, Jurisdiction, and Venue

24.

Plaintiff Gregory is a domiciliary of the State of Georgia and Putnam County.

25.

Plaintiff Wells is a domiciliary of the State of Georgia and Jenkins County.

26.

Defendant PFSI is an Indiana foreign corporation doing business in Georgia and can be served a copy of this Fourth Amended Complaint with service to its attorneys David A. Lester, 1819 5th Ave. North, Suite 1100, Birmingham, Alabama, 35203 and William E. Raney, 310 West 20th Street, Suite 300, Kansas City, Missouri, 64108.

27.

PFSI has not registered with the Georgia Secretary of State and is not authorized to transact business in Georgia.

28.

PFSI is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as PFSI transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

29.

PFSI regularly does and solicits business, and engages in other persistent courses of conduct, and derives substantial revenue from services rendered in this state.

30.

PFSI has not complied with the registration requirements of OCGA § 18-5-3.1 and is not authorized to offer debt adjustment services in this state but has nevertheless engaged in said debt adjustment services.

31.

Defendant Larry D. Wilson, testifying as PFSI's Fed. R. Civ. P. 30(b)(6) witness, has stated that the goal of PFSI is not to help individuals become debt free, as PFSI advertises, instead, that the company has morphed into a program that allow consumers to manage their debts on their own.  Doc. 65, p. 8.

32.

Defendant PFSI is the hub of the debt adjustment services operation.  All phases of the operation are controlled by PFSI.  To wit:

- PFSI recruited the debt adjustment customers through its marketing arm, CCR, (Doc. 85-5);

- PFSI recruited the attorneys that comprise what is referred to as "national mediation counsel" and housed the attorneys in their own office space, (Doc. 24, p. 4);

- PFSI created "The Enrolled Members Trust," which is the *res* designed to allegedly hold the customers' funds until payment of an enrollment fee of seven percent (7%) of the amount of debt enrolled into the Program is due to PFSI, (Doc. 103-2, p. 22), a monthly maintenance fee of $49.95 for every person who enrolled in the program to PFSI, (Id. at p. 23), or a "mediation fee" of 25% when a debt is settled (Id.);

- PFSI exclusively controlled the funds held in the Enrolled Members Trust, (Doc. 65, p. 14);

- PFSI employees were the individuals that "enroll" the customers and then "pass" the customers' information onto "national mediation counsel" who employed non-attorney personnel attempt to negotiate settlements of the customers' debts with their creditors, (Doc. 34, pp. 6, 10);

- PFSI even paid the payroll for the national mediation counsel's non-attorney employees that allegedly negotiated settlements of the cuctomers' debts, (Doc. 65, p. 12);

- PFSI also collects all of the miscellaneous service fee, the NSF charges, and the ACH charges that are collected from each of the customers enrolled in the debt adjustment scheme, (Doc. 65 p. 13); and

- PFSI provided the $100.00 initial retainer fee for the Local Participating Program Attorneys ("LPPAs") by passing said funds through the national mediation counsel and after PFSI had begun to collect monies from the customers (Doc. 34, p. 25).

33.

Venue is proper in this Court as to PFSI pursuant to OCGA § 9-10-93.

34.

Defendant CCR is an Indiana foreign corporation doing business in Georgia and can be served a copy of this Fourth Amended Complaint with service to its attorneys David A. Lester, 1819 5th Ave. North, Suite 1100, Birmingham, Alabama, 35203 and William E. Raney, 310 West 20th Street, Suite 300, Kansas City, Missouri, 64108.

35.

CCR has not registered with the Georgia Secretary of State and is not authorized to transact business in Georgia.

36.

CCR is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as CCR transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

37.

CCR regularly does and solicits business, and engages in other persistent courses of conduct, and derives substantial revenue from services rendered in this state.

38.

CCR has not complied with the registration requirements of OCGA § 18-5-3.1 and is not authorized to offer debt adjustment services in this state but has nevertheless engaged in said debt adjustment services.

39.

CCR is the marketing arm of the debt adjustment services scheme, and is a trademark used by PFSI for marketing purposes.  Doc. 65, pp. 17, 25, 64.

40.

Venue is proper in this Court as to CCR pursuant to OCGA § 9-10-93.

41.

At all times relevant to acts and omissions complained of in this action, Defendant Thomas P. Dakich is an attorney licensed to practice law in Indiana and doing business as Dakich & Associates f/k/a Baldwin & Dakich.

42.

Defendant Dakich is an Indiana-licensed attorney, and operates as an integral part of the debt adjustment services scheme as what Defendants have deemed to be the "National Mediation Law Firm." Doc. 1-2, p. 35.

43.

Thus, ostensibly, Dakich is the entity that performs the debt negotiation of behalf of Plaintiffs, PFSI and CCR.

44.

Dakich furthered the conspiracy, enterprise, and joint venture of the debt adjustment services operation of Defendants by being a primary participant in the alleged negotiations with the Plaintiffs' and the Georgia putative class members' creditors in violation of the Act. Dakich was paid from the illegal fees being charged by the Defendants.

45.

Dakich is not a member of the State Bar of Georgia.

46.

Dakich has not applied for, nor has Dakich received permission to practice *pro hac vice* in the courts of Georgia.

47.

Dakich is not registered with the Georgia Secretary of State and is not authorized to transact business in Georgia.

48.

Dakich is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as Dakich transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

49.

Dakich regularly does and solicits business, and engages in other persistent courses of conduct, and derives substantial revenue from services rendered in this state.

50.

Dakich has not complied with the registration requirements of OCGA § 18-5-3.1 and is not authorized to offer debt adjustment services in this state but has nevertheless engaged in said debt adjustment services.

51.

Dakich will be served a copy of this Fourth Amended Complaint with service to his attorneys David A. Lester, 1819 5th Ave. North, Suite 1100, Birmingham, Alabama, 35203 and William E. Raney, 310 West 20th Street, Suite 300, Kansas City, Missouri, 64108.

52.

Venue is proper in this Court as to Defendant Dakich pursuant to OCGA § 9-10-93.

53.

At all times relevant to acts and omissions complained of in this action, Defendant Jeff Whitehead ("Whitehead") is a domiciliary of Illinois and Cook County.

54.

Defendant Whitehead is an attorney licensed to practice law in Illinois and is a member of the State Bar of Illinois and has done business with the members of the putative Class in the State of Georgia.

55.

Whitehead assumed the role of what PFSI called their "national mediation counsel," taking over for his predecessor, Thomas Dakich, which included communicating with Georgia resident debtors and their creditors.  Doc. 103-5, pp. 4, 8.

56.

Whitehead furthered the conspiracy, enterprise, and joint venture of the debt adjustment services operation of Defendants by being a primary participant in the alleged negotiations with the Plaintiffs' and the Georgia putative class members' creditors in violation of the Act. Whitehead was paid from the illegal fees being charged by the Defendants.

57.

Whitehead is represented by Attorneys David Lester and William Raney who will be served with a copy of the Fourth Amended Complaint *via* the CM/ECF system.

58.

Whitehead is not a member of the State Bar of Georgia and has not applied for, nor has he received permission to practice *pro hac vice* in the courts of Georgia.  Doc. 103-5, p. 2.

59.

Whitehead is not registered with the Georgia Secretary of State and is not authorized to transact business in Georgia.

60.

Whitehead is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as Whitehead transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

61.

Whitehead regularly does and solicits business, and engages in other persistent courses of conduct, and derives substantial revenue from services rendered in this state.  Doc. 103-5, p. 8.

62.

Whitehead has not complied with the registration requirements of OCGA § 18-5-3.1 and is not authorized to offer debt adjustment services in this state but has nevertheless engaged in said debt adjustment services.

63.

Venue is proper in this Court as to Defendant Whitehead pursuant to OCGA § 9-10-93.

64.

Jeffrey Brooks is the president and Chief Executive Officer of Defendant PFSI and actively participated in the management of Preferred Financial Solutions, Inc. and participated in the violations of Georgia law.

65.

Brooks furthered the conspiracy, enterprise, and joint venture of the debt adjustment services operation of Defendants being one of the owners of PFSI and creating, designing, and implementing the illegal debta adjusting scheme.  Brooks was paid from the illegal fees being charged by the Defendants.

66.

Defendant Brooks was a member of the management team that initiated the CCR program through PFSI.  Doc. 35, pp. 28-29.

67.

Brooks testified that seeking business in the State of Georgia was a conscience, knowing decision following the 2003 amendment of the GDAA, as Defendant Brooks stated that it was only after the inception of the LPPA concept and the ostensible "association" of a Georgia LPPA would PFSI take in a Georgia resident client.  Doc. 35, p. 35.

68.

Brooks is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as Brooks transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

69.

Brooks regularly does and solicits business, and engages in other persistent courses of conduct, and derives substantial revenue from services rendered in this state.

70.

Brooks has not complied with the registration requirements of OCGA § 18-5-3.1 and is not authorized to offer debt adjustment services in this state but has nevertheless engaged in said debt adjustment services.

71.

Brooks will be served with a copy of this Fourth Amended Complaint with service to his attorneys David A. Lester, 1819 5th Ave. North, Suite 1100, Birmingham, Alabama, 35203 and William E. Raney, 310 West 20th Street, Suite 300, Kansas City, Missouri, 64108.

72.

Venue is proper in this Court as to Brooks pursuant to OCGA § 9-10-93.

73.

Wilson served as PFSI' Vice-President and currently as Chief Operating Officer ("COO") of Defendant Preferred Financial Solutions, Inc., and actively participated in the management of Preferred Financial Solutions, Inc. and participated in the violations of Georgia law..

74.

Wilson is actively involved in the day to day operations of PFSI and has assisted in the design and implementation of a Debt Settlement Program that defrauds consumers in violation of the Georgia Debt Adjustment Act, OCGA § 18-5-1 *et seq*, including the members of the putative class.

75.

In fact, Wilson's knowledge of the operations of PFSI is so extensive that PFSI designated him as a corporate representative capable of responding to categories of inquiry pursuant to a Notice of Deposition under Fed. R. Civ. P. 30(b)(6).

76.

Wilson testified that the goal of PFSI is not to help individuals become debt-free, as PFSI advertises, instead, the company has morphed into a program that allows consumers to manage their debts on their own.  Doc. 65, p. 8.

77.

For this, the Defendants charge Georgia resident debtors, such as Plaintiffs and the members of the putative class, illegal and unconscionable fees and provide nothing of value in return.  Wilson assisted in the design and implementation of this illegal program.

78.

Wilson is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as Wilson transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

79.

Wilson regularly does and solicits business, and engages in other persistent courses of conduct, and derives substantial revenue from services rendered in this state.

80.

Wilson has not complied with the registration requirements of OCGA § 18-5-3.1 and is not authorized to offer debt adjustment services in this state but has nevertheless engaged in said debt adjustment services.

81.

Wilson will be served with a copy of this Fourth Amended Complaint with service to his attorneys David A. Lester, 1819 5th Ave. North, Suite 1100, Birmingham, Alabama, 35203 and William E. Raney, 310 West 20th Street, Suite 300, Kansas City, Missouri, 64108.

82.

Venue is proper in this Court as to Wilson pursuant to OCGA § 9-10-93.

83.

Mlynski is an equity owner and the partner in charge of PFSI operations in Chicago, IL. and actively participated in the management of Preferred Financial Solutions, Inc. and participated in the violations of Georgia law.

84.

Mlynski came up with the idea of forming the debt adjustment services scheme.

85.

Among other things, Mlynski worked with marketing for PFSI, procuring media and working indirectly on the content and the production of the actual advertising to promote the Defendants debt adjustment services operation in several states, including Georgia.

86.

Mlynski knew or should have known that the advertisement promotions of PFSI reached Georgia resident debtors who became customers of PFSI and participated in the Defendants' debt adjustment services operation.

87.

Mlynski is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as Mlynski transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

88.

Mlynski regularly does and solicits business, and engages in other persistent courses of conduct, and derives substantial revenue from services rendered in this state.

89.

Mlynski has not complied with the registration requirements of OCGA § 18-5-3.1 and is not authorized to offer debt adjustment services in this state but has nevertheless engaged in said debt adjustment services.

90.

Mlynski will be served with a copy of this Fourth Amended Complaint with service to his attorneys David A. Lester, 1819 5th Ave. North, Suite 1100, Birmingham, Alabama, 35203 and William E. Raney, 310 West 20th Street, Suite 300, Kansas City, Missouri, 64108.

91.

Venue is proper in this Court as to Mlynski pursuant to OCGA § 9-10-93.

92.

Yuska is the Chief Financial Officer ("CFO") and Director of Information Technology ("IT") of PFSI and actively participated in the management of Preferred Financial Solutions, Inc. and participated in the violations of Georgia law.

93.

As CFO, Yuska was substantially involved with the financial aspects of PFSI, including but not limited to, the charging of fees to Plaintiffs and other putative class members in excess of that allowed under the Georgia Debt Adjustment Act, OCGA § 18-5-1 *et seq.*

94.

Moreover, as IT Director, Yuska worked directly with Defendants' computer system, which allowed for the electronic storage of client documents and files.   This system facilitated the fraud committed against Plaintiffs and other putative class members.

95.

As a result, Yuska materially participated in the corporate torts set forth herein.

96.

Yuska is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as Yuska transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

97.

Yuska regularly does and solicits business, and engages in other persistent courses of conduct, and derives substantial revenue from services rendered in this state.

98.

Yuska has not complied with the registration requirements of OCGA § 18-5-3.1 and is not authorized to offer debt adjustment services in this state but has nevertheless engaged in said debt adjustment services.

99.

Yuska will be served with a copy of this Fourth Amended Complaint with service to his attorneys David A. Lester, 1819 5th Ave. North, Suite 1100, Birmingham, Alabama, 35203 and William E. Raney, 310 West 20th Street, Suite 300, Kansas City, Missouri, 64108.

100.

Venue is proper in this Court as to Yuska pursuant to OCGA § 9-10-93.

101.

Miller is a manager and equity owner of Defendant Preferred Financial Solutions, Inc., and actively participated in the management of Preferred Financial Solutions, Inc. and participated in the violations of Georgia law.

102.

Miller is the Sales Manager of PFSI as well as special projects manager in which he was responsible for designing information technology to make PFSI more efficient in handling their customers' requests.

103.

Miller was also instrumental in the design and implementation of the customer care department of PFSI and structured the services that the customer care department offered, as well as increasing the likelihood that the customer care department would enroll and retain customers, including Plaintiffs and the putative class members.

104.

Miller is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as Miller transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

105.

In his role as Sales Manager, Miller trains and oversees the telephone representatives who field initial telephone calls with PFSI clients.

106.

It is at the direction of Miller that representatives of PFSI made and makes certain misrepresentations to consumers, including, but not limited to, the fraudulent promise that consumers will become "debt free."

107.

In addition, at the direction of Miller the PFSI representatives make statements to consumers about the amount of fess involved, which Plaintiffs allege are far and beyond that is allowed under the Georgia Debt Adjustment Act, OCGA § 18-5-1 *et seq.*

108.

Miller regularly does and solicits business, and engages in other persistent courses of conduct, and derives substantial revenue from services rendered in this state.

109.

Miller has not complied with the registration requirements of OCGA § 18-5-3.1 and is not authorized to offer debt adjustment services in this state but has nevertheless engaged in said debt adjustment services.

110.

Miller will be served with a copy of this Fourth Amended Complaint with service to his attorneys David A. Lester, 1819 5th Ave. North, Suite 1100, Birmingham, Alabama, 35203 and William E. Raney, 310 West 20th Street, Suite 300, Kansas City, Missouri, 64108.

111.

Venue is proper in this Court as to Miller pursuant to OCGA § 9-10-93.

112.

At all times relevant to acts and omissions complained of in this action, Defendant Rhonda Roell-Taylor ("Taylor") is a domiciliary of Georgia and of Bibb County and is subject to the personal jurisdiction of this Court.

113.

Defendant Taylor is an attorney licensed to practice law in Georgia and is a member of the State Bar of Georgia.

114.

Taylor is represented by attorney James W. Davis who will be served with a copy of this Fourth Amended Complaint at 143 Lamar Street, Macon Georgia, 31204.

115.

Taylor functioned as a pawn in the Defendants' scheme of debt adjusting by acting as one of the "Local Participating Program Attorneys" ("LPPA") who are Georgia-licensed attorneys.

116.

Taylor supposedly reviewed the Plaintiffs' enrollment forms, conducted a telephone consultation with the Georgia clients, and sent an engagement letter to the Georgia clients.

However, both Plaintiffs have testified that neither of them knew who Taylor was until after the initiation of this action.

117.

The LPPA fee is charged to the debtor to pay an attorney licensed in Georgia so that Defendants can attempt to avoid the implications of Georgia's Debt Adjustment Act by attempting to qualify for the Act's exemption for debt adjustment services incidental to the practice of law, pursuant to OCGA § 18-5-3.

118.

Defendant Taylor participated in the debt adjustment scheme by allegedly communicating with Georgia resident debtors to encourage such debtors to participate in the debt settlement operation of Defendants.  See generally Doc. 28-2 (Letter to Defendant Pearson from Defendant Whitehead describing the duties of an LPPA).

119.

At all times relevant to acts and omissions complained of in this action, Defendant Laquetta S. Pearson ("Pearson") is a domiciliary of Georgia and of Fulton County and is subject to the personal jurisdiction of this Court.

120.

Defendant Pearson is an attorney licensed to practice law in Georgia and is a member of the State Bar of Georgia.

121.

Defendant Pearson did business with the members of the putative Class in the State of Georgia.

122.

Pearson participated in the Defendants' debt adjustment services operation by communicating with Georgia resident debtors encouraging such debtors to participate in the Defendants' debt adjustment services operation.

123.

In addition, the personal activity performed by Pearson furthered the conspiracy and enterprise of the debt adjustment services operation of the Defendants targeting financially-troubled consumers which extracting fees from the Georgia resident debtors in violation of the Act.  Pearson was paid from the illegal fees being charged by the Defendants.

124.

Pearson is represented by Attorneys David Lester and William Raney who will be served with a copy of the Fourth Amended Complaint *via* the CM/ECF system.

125.

Pearson functioned as a pawn in the Defendants' scheme of debt adjusting by acting as one of the "Local Participating Program Attorneys" ("LPPA") who are Georgia-licensed attorneys.

126.

Pearson supposedly reviewed the Plaintiffs' enrollment forms, conducted a telephone consultation with the Georgia clients, and sent an engagement letter to the Georgia clients.

127.

The LPPA fee is charged to the debtor to pay an attorney licensed in Georgia so that Defendants can attempt to avoid the implications of Georgia's Debt Adjustment Act by

attempting to qualify for the Act's exemption for debt adjustment services incidental to the practice of law, pursuant to OCGA § 18-5-3.

128.

Defendant Pearson participated in the debt adjustment scheme by allegedly communicating with Georgia resident debtors to encourage such debtors to participate in the debt settlement operation of Defendants.  See generally Doc. 28-2 (Letter to Defendant Pearson from Defendant Whitehead describing the duties of an LPPA).

**Facts as to Plaintiff Gregory**

129.

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully restated herein and further state as follows:

130.

Prior to January of 2008, Plaintiff Gregory had undergone financial difficulties and, as a result, had amassed debt in the form of unsecured credit card debt.

131.

Plaintiff Gregory had incurred approximately $26,210.00 in unsecured debt owed to eight creditors.

132.

Due to the interest rates charged by the creditors and the large amount owing on these accounts, Ms. Gregory began to have significant difficulty meeting her monthly financial obligations.

133.

Plaintiff Gregory became aware of Defendants through its self-promotion advertising *via* the internet and broadcast media.

134.

The PFSI Defendants controlled the advertisement and internet content but their representations were known to the Attorney Defendants (Defendants Dakich, Whitehead, Roell-Taylor and Pearson).  Defendants through the PFSI Defendants promoted themselves on the "Our Program" page of their website at http://www.ccrnow.com (last visited August 4, 2011) as an "attorney driven debt compromise program" which "is among the most successful in the country,  . . ."

135.

As a Debt Settlement Program (hereinafter "DSP"), Defendants describe their program in more detail by stating,

> Your success in this program is driven by two important events.  One, is the experience and commitment of your program Attorney to aggressively mediate your debt, and two, your ability to make routine monthly payments to The Enrolled Members Trust which is set up for the future benefit of your creditors.  (Note:  The recommended minimum monthly payment is usually between 2 and 3 percent of your total unsecured debt.  However, the more you can allocate to your Trust account, the sooner your program Attorney can negotiate, or settle your debt.)
>
> . . .
>
> As funds accumulate in the third party independent Trust, which is managed by a National Bank, your program Attorney begins exploring settlement possibilities with each of your enrolled creditors.
>
> . . .
>
> When adequate funds accumulate in the Trust to generate a discounted offer to your creditor, your program Attorney contacts both you and your creditor to solidify a plan.  If a settlement offer is agreed upon, then the client, the client's program Attorney, and the Trust pay the creditor the agreed settlement. Furthermore, the settlement is documented to ensure accurate record keeping of this transaction.

http://www.ccrnow.com (last visited August 4, 2011).

136.

Thus, a debtor participating in the DSP will pay a certain sum, determined by the PFSI Defendants, monthly into said account, thereby diverting all monthly payments toward debts that have been "enrolled" in the DSP.

137.

The apparent purpose of the DSP program is to "sweat-out" a debtor's creditors by withholding payments towards the debts for several months, causing the debts to enter default, and/or forcing the original creditors to "charge-off" the debt and/or sell the debt to a "junk" debt buyer who purchases the debt for fractions of its pre-default value.  Once the debt is in default, charged off, or sold to a debt buyer, Defendants will allegedly attempt to negotiate a settlement of the amount owed at a discount of the originally owed amount.

138.

The PFSI Defendants' website, under the "About Us" section, further claims that said Defendants utilize:

> Enrollment Specialists take all incoming calls and provide new clients with a detailed overview of how the Credit Card Relief program works.  During your discussion with an Enrollment Specialist, all program fees will be disclosed (Remember, no fees are charged until your program Attorney first settles a debt) and your debt situation reviewed so that an estimate can be provided indicating how long it may take for you to graduate debt free.
>
> . . .
>
> Underwriters review every document in your enrollment package and help you complete any missing information that may have been omitted on the Financial Statement or Enrollment paperwork. These Underwriting professionals work with you to establish a monthly payment to the Trust for the future benefit of your creditors while also helping you understand what to expect in the months  ahead.   If  you  have  any  specific  questions,  the

Underwriters are able to provide additional insights so that you
have a complete understanding of the CCR program.

. . .

Your program Attorney will develop a specific strategy to
eliminate your debt.   Many factors, such as the amount and
regularity of your monthly payments to the Trust, the temperament
of your specific Creditors, the age and amount of each debt
enrolled, etc. will influence the length of time and your success in
the program.   You can be certain that you are represented by an
Attorney who has experience mediating debt, who is in daily
contact with creditors, who uses technology and tactful negotiating
skills, and has a proven track record of success in settling debt at a
discount.

http://www.ccrnow.com (last visited June 9, 2011).

139.

These Enrollment Specialists and Underwriters are employees of PFSI and were trained

by Defendant Miller.

140.

On or about January 15, 2008, Plaintiff Gregory entered into separate Enrollment and Fee

Disclosure Agreements (hereinafter "Enrollment Agreement" and "Fee Agreement" respectively,

"Agreements" collectively) wherein Defendants agreed to assist in resolving debts owed to

Plaintiff's creditors by, as the Enrollment Agreement states, "solicit[ing] offers in compromise

(settlement) with clients' (co-settlors) creditors."

141.

The Fee Agreement details a total enrollment fee charged to Plaintiff Gregory by

Defendants of $1,834.70 based on a total $26,210.00 in enrolled debt.  Doc. 39, pp. 5-7.

142.

Defendants' Fee Agreement states that *included* in the enrollment fee is the "limited

engagement of your LOCAL PARTICIPATING PROGRAM ATTORNEY (LPPA)

ENGAGEMENT FEE which is a *one-time fee* of $120.00 for review of your Enrollment Forms by the LPPA, their initial telephone consultation with you and the engagement letter."

143.

Though Defendant's Fee Agreement clearly states that the LPPA fee is included in the $1,834.70 enrollment fee, Plaintiff Gregory's April and May statements show that the $120.00 LPPA fee was placed directly in and disbursed from the trust account and did not reduce the balance owed on Plaintiff's enrollment fee.

144.

At no time during Plaintiff Gregory's enrollment in Defendants' DSP did Plaintiff ever receive any communication from Defendant Rhonda Roell-Taylor or any Georgia licensed attorney, much less anyone identifying herself as a "LOCAL PARTICIPATING PROGRAM ATTORNEY."

145.

The Fee Agreement further states that Defendants charge a flat $49.95 monthly maintenance fee "which offsets the cost of maintaining full time Client Care, Accounting, Processing, Underwriting and Compliance Departments."

146.

The Fee Agreement lists Plaintiff Gregory's "monthly commitment to the trust" as $475.00, though this was subsequently and inexplicably amended to $500.00 per month.

147.

Plaintiff Gregory began making the $500.00 per month payments to Defendants for her participation in the program around January 16, 2008 and continued to make payments until July 21, 2008.

148.

Plaintiff Gregory made twelve timely bi-monthly payments to Defendants *via* electronic funds transfer ("EFT") in the amount of $250.00 for the months of February through July of 2008, plus the *extra* $120.00 LPPA fee, for a total $3,120.00 paid to Defendants.  Doc. 47-3.

149.

Plaintiff stopped participation in the program on or about July 22, 2008 when she cancelled the Agreements by notifying a PFSI employee in their Client Care Department *via* telephone.

150.

At no time during Plaintiff Gregory's enrollment in Defendants' DSP did Defendants make any payments on the Plaintiff's behalf to any of Plaintiff's unsecured creditors.

151.

At no time during Plaintiff Gregory's enrollment in Defendants' DSP did Defendants make any attempts to settle Plaintiff's debt with any of Plaintiff's unsecured creditors.

152.

Defendants refunded to Plaintiff Gregory only the $819.59 that Defendants had paid into the Enrolled Members Trust after Defendants had received all of their own fees in full.

153.

Defendants retained their entire $1,830.76 enrollment fee, $349.65 in maintenance fees and the $120.00 LPPA fee for a total $2,300.41 of the funds paid by Plaintiff Gregory to Defendants for debt adjustment services.  See Doc. 77-3.

154.

On March 16, 2009 Plaintiff Gregory, through her counsel, sent Defendants a demand letter which detailed Plaintiff Gregory's potential claims against Defendants for violations of the Georgia Debt Adjustment Act and Fair Business Practices Act and requested a full refund of the $3,000.00 paid by Plaintiff Gregory into Defendants' DSP along with the $5,000.00 penalty authorized by the Debt Adjustment Act.  Doc. 77-4.

155.

On or about April 10, 2009 Plaintiff Gregory received Defendants' reply along with a check drawn on the "Enrolled Members Trust Refund Account," held in Fifth Third Bank of Central Indiana, made out to Plaintiff Gregory for $1,710.76.  Doc. 77-5.

156.

Defendants' reply, signed by Defendant Wilson, explains that it is refunding the additional $1,710.76 not previously refunded to Ms. Gregory and retaining the remaining $469.65 "for services rendered during the duration of client's enrollment into [*sic*] the program," though it does not detail exactly what those services were.  Doc. 77-5.

157.

Defendants' reply states that Defendant "Credit Card Relief™ does not operate as a debt adjustment service and that the company never has operated as such;" rather, Defendant CCR "serves as the back office service provider to the Enrolled Members Trust."  Doc. 77-5.

158.

Defendants' reply further states that all of its Georgia clients are "law clients of Rhonda Roell-Taylor, [*sic*] attorney licensed by [*sic*] Georgia State Bar and a member in good standing,"

who have been personally interviewed by Ms. Roell-Taylor as a prerequisite to becoming her client.  Doc. 77-5.

159.

Defendants' reply further states that "Prior to the person becoming a client of Ms. Roell-Taylor, the person must pass a comprehensive underwriting and credit analysis and submit to a personal interview with Ms. Roell-Taylor before being admitted to the program."  Doc. 77-5.

160.

Defendants' reply states that "[a]s the program in [*sic*] a function of Ms. Roell-Taylor's law practice," the "program" is not subject to Georgia's Debt Adjustment Act.  Doc. 77-5.

161.

Defendants' reply states that the "Enrolled Members Trust" is an "independent trust operated by [*sic*] independent third party Trustee" and, quite nonsensically, that all money placed into the trust is "held under the sole direction of the client/co-settlor and the client."  Doc. 77-5.

**Facts as to Plaintiff Wells**

162.

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully restated herein and further state as follows:

163.

Prior to May 2010, Plaintiff Wells had amassed debt in the form of unsecured credit card debt.

164.

Plaintiff Wells had incurred approximately $19,786.12 in unsecured debt owed to four creditors.

165.

Due to the interest rates charged by the creditors and the large amount owing on these accounts, Wells began to have significant difficulty meeting his monthly financial obligations.

166.

Plaintiff Wells first heard of CCR when his fiancée told him about it and provided his telephone number to CCR, and was quickly contacted by a PFSI employee.  Doc. 37, pp. 40-41.

167.

On or about May 28, 2010, Plaintiff Wells entered into separate Enrollment and Fee Disclosure Agreements that were identical or substantially similar to those entered into by Plaintiff Gregory, for Defendants to engage in Debt Adjustment services.

168.

At no time during Plaintiff Wells' enrollment in Defendants' DSP did Defendants make any payments on the Plaintiff's behalf to any of Plaintiff's unsecured creditors.

169.

At no time during Plaintiff Wells' enrollment in Defendants' DSP did Defendants make any attempts to settle Plaintiff's debt with any of Plaintiff's unsecured creditors.

170.

Defendants collectively received $3,150.00 from Plaintiff Wells' bank account and retained all of said sum as their "fees" for performing debt adjusting services.

**Georgia's Debt Adjustment Act**

171.

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully restated herein and further state as follows:

172.

The Georgia Debt Adjustment Act, OCGA § 18-5-1, defines debt adjusting as:

> [D]oing business in debt adjustments, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with a debtor for a fee to:
>
> (A)   Effect the adjustment, compromise, or discharge of any account, note or other indebtedness of the debtor;
>
> (B)   Receive from the debtor and disburse to his or her creditors any money or other thing of value.

173.

From its initial creation by the Georgia General Assembly in 1956 until its amendment of July 1, 2003, the Georgia Debt Adjustment Act stated that "***[i]t shall be unlawful*** for any person to engage in the business of debt adjusting" and that "[a]ny person who engages in the business of debt adjusting . . . shall be guilty of a misdemeanor."   OCGA § 18-5-2 (1956) (emphasis added).

174.

Thus, the original Act undeniably closed and locked the door for persons to offer debt adjusting for a fee in this state, unless incidental to the practice of law.

175.

In 2003, the General Assembly substantially amended the Act.   In the amendment's enabling clause, the legislature stated that the purpose is:

> To limit the maximum charge that may be imposed for the provision of debt adjustment services; to provide for definitions; to provide for exemptions from those provisions related to debt adjustment; to require persons engaged in debt adjusting to obtain an annual audit of all accounts and to maintain a certain amount and type of insurance coverage; to provide for the disbursement of a debtor's funds within 30 days of receipt; to require persons

> engaged in debt adjusting to maintain trust accounts for debtors'
> funds; to provide for civil and criminal violations and penalties; to
> provide for investigation and enforcement; to provide for related
> matters; to provide for an effective date; to repeal conflicting laws;
> and for other purposes.

2003 Ga. Laws No. 103 p. 392 (House Bill No. 385).

176.

The amended Act thus removed the out-and-out prohibition on debt adjusting for a fee and cracked the door to allow debt adjusters to operate in Georgia as long as the Act's mandates are followed.

177.

The amended Act commands the debt adjuster "*shall* maintain a separate trust account for the receipt of any and all funds from debtors and the disbursement of such funds on behalf of debtors" (OCGA § 18-5-3.2(b)); "*shall* disburse to the appropriate creditors all funds received from the debtor, less any fees authorized by [the Act], within thirty days of receipt" (OCGA § 18-5-3.2(a)); "*shall* obtain annual audits from independent CPAs on all accounts in which Georgia debtors' funds have been deposited" (OCGA § 18-5-3.1(a)(1)); "*shall* obtain a specified level of insurance coverage for employee dishonesty depositor's forgery and computer fraud" (OCGA § 18-5-3.1(a)(2)); and "*shall* not:

> accept from a debtor who resides in this state, either directly or
> indirectly, any charge, fee, contribution, or combination thereof in
> an amount in excess of 7.5 percent of the amount paid monthly by
> such debtor to such person for distribution to creditors of such
> debtor . . .

OCGA § 18-5-2.

178.

The amendment further provided for a civil remedy for a person's violation of the Act. OCGA § 18-5-4 states:

Any person who engages in debt adjusting in violation of the provisions of [OCGA § 18-5-2 or § 18-5-3.2(a)] shall further be liable to the debtor in an amount equal to the total of all fees, charges, or contributions paid by the debtor plus $5,000.00. Such debtor shall have the right to bring a cause of action directly against such person for violation of the provisions of this chapter.

### Class Allegations

179.

Plaintiffs seek to have this Court certify the following class (hereinafter "Class"):

All persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Defendants on or after July 1, 2003 and from whom Defendants accepted, directly or indirectly, any charge, fee, contribution, or combination thereof.

180.

On information and belief, the named Plaintiffs and the Plaintiff Class Members were solicited by Defendants through a standard marketing scheme through which the Defendants offered Debt Adjustment services through Defendants' standard Debt Settlement Program. Such marketing and services are typical of those experienced by the Plaintiffs and the proposed Plaintiff Class Members.

181.

Defendants commonly targeted Georgia residents for Debt Adjustment services from the payment of fees to other marketing entities.

182.

On information and belief, the fees collected by the Defendants from the proposed Plaintiff Class Members are uniformly assessed to every customer of Defendants and can readily be determined from a ministerial review of the records of the Defendants.

183.

On information and belief, the contract entered into between Defendants and Plaintiffs are standard contracts which are substantially the same as the contract Defendants entered into with the Plaintiff Class Members.

184.

The names and addresses of the Plaintiff Class Members can readily be determined from a ministerial review of the records of the Defendants and through the account statements of the Defendants pertaining to collection of such charges, fees, contributions, or combinations thereof.

185.

The membership of the class is numerous and joinder of individual plaintiffs is impractical.  On information and belief, the Defendants have provided Debt Adjustment services to approximately 751 residents of the State of Georgia since July 1, 2003.

186.

There are questions of law and fact common to all members of the Plaintiff class, and these common questions of law and fact predominate over any individual issues.  The principle questions pertinent to the class as a whole include:

a)  Whether the Defendants' standard means of doing business in debt adjustments, debt settlement, debt reduction,, budget counseling, and debt management constitutes "Debt Adjustment" under OCGA § 18-5-1;

b)  Whether Defendants violated OCGA § 18-5-2 by accepting excessive fees from Plaintiff Class Members for the provision of Debt Adjustment services;

c) Whether Defendants violated OCGA § 18-5-3.(2(a)) by failing to "disburse to the appropriate creditors all funds received from the debtor…within thirty days of receipt";

d) Whether Defendants fraudulently and materially misrepresented their ability to adjust or resolve the debts of the Plaintiff Class Members;

e) Whether Defendants breached their fiduciary duty by failing to comply with the Georgia Debt Adjustment Act, by misrepresenting the willingness of creditors to resolve class member debt through debt settlement, by misrepresenting the ability of Defendants to resolve class member debts, by failing to secure agreements with creditors of the class members to resolve their debts, and by performing no service of value for the fees the Defendants received;

f) The liability of the Defendants for violation of the Georgia Debt Adjustment Act;

g) The appropriate measure of damages and the appropriate remedies;

h) Defenses raised by the Defendants;

i) The availability of statutory damages pursuant to OCGA § 18-5-4; and

j) The need and appropriateness of injunctive relief.

187.

The claims of the named Plaintiffs are typical of the claims of the Plaintiff Class Members, which all arise from the same operative facts and are based on the same legal theory, and Plaintiffs' claims will thus adequately represent those of the Plaintiff Class Members.

188.

The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class Members. Plaintiffs have retained counsel with experience in class action litigation, and they are not aware of any interest that might cause them not to vigorously pursue this case.

189.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder is impracticable. The expense and burden of individual litigation make it virtually impossible for the members of the class to proceed individually, and it is therefore most efficient to resolve all claims based on the Defendants' conduct in one forum.

190.

The Plaintiffs are aware of no difficulties that will be encountered in the management of this litigation that would render the action unmanageable. This is not a class action that will require an analysis of the Defendants' conduct as to individual class members.

191.

Prosecution of separate actions by individual Plaintiff Class Members would create adjudications that would be dispositive of the interests of the other members not parties to the adjudication. Plaintiffs are not aware of any other pending actions against these Defendants for these same causes of action.

192.

Without a class action mechanism, members of the Plaintiff Class would be substantially impaired or impeded in their ability to protect their interests. The value of claims of the individual class members would be in an amount that makes prosecution outside of the class action uneconomical.

193.

A final judgment on the merits of the named Plaintiffs' claims would be fully dispositive of the claims and interests of those similarly situated who are not specifically named as a plaintiff in this action.

## COUNT I – Violations of the Debt Adjustment Act, As Amended

194.

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully restated herein and further state as follows:

195.

Defendant Mlynski is the equity owner and manager primarily responsible for marketing of the debt adjustment services scheme.

196.

Defendants through their actions within the PFSI Debt Settlement Program fall squarely within the definition of "debt adjuster" under the Act.

197.

Although Georgia's Debt Adjustment Act allows for an exemption "situations involving debt adjusting incurred in the practice of law in this state," OCGA § 18-5-3, Defendants do not qualify for said exemption.

198.

Rather, PFSI and its management team conceived of the idea to attempt to place themselves outside the ambit of the GDAA by associating a Indiana lawyer (initially Defendant Dakich and later Defendant Whitehead) as their "national mediation counsel" who would then in turn "associate" a Georgia-licensed attorney as their Local Participating Program Attorneys ("LPPAs") (Defendants Taylor and Pearson).

199.

The debt adjustment activities, if any, were all conducted by the non-attorney employees of the "national mediation counsel" who were paid by PFSI in a state other than Georgia.  Doc. 65, p. 12.

200.

The "national mediation counsel" would then pay $100.00 to the LPPA to ostensibly review the customers' file, however no attorney-client relationship was created by this payment to the Georgia-licensed attorney.

201.

However, the Georgia customers, like Gregory and Wells, were already customers of the PFSI Defendants and had already paid money to the PFSI Defendants' DSP before contact was ever made with the LPPA.  The LPPAs are not required to perform any action for the Georgia customer because the scheme was constructed to allow the Georgia customer to participate without the LPPAs' approval of PFSI's actions.  See Doc. 42.

202.

Defendants have not engaged in the practice of law in this state on behalf of Plaintiffs. Defendants Taylor and Pearson had no true attorney-client relationship with the Plaintiffs nor with the Plaintiff Class Members.  Defendants Taylor and Pearson would have never known of the Plaintiffs nor the Plaintiff Class Members without the advertisement of the PFSI Defendants inviting the Plaintiffs and the Plaintiff Class Members to participate in the PFSI Defendants' debt adjustment services operation.

203.

Plaintiff Gregory has never spoken with Defendant Taylor *via* telephone or otherwise, and has certainly never been personally interviewed by Defendant Taylor.  Doc. 77-5.

204.

PFSI Defendants and Defendant Dakich entered into the Agreements with Plaintiff Gregory on or about January 15, 2008 to provide Debt Adjustment services for a fee.

205.

PFSI Defendants and Defendant Dakich entered into the Agreements with Plaintiff Wells on or about May 28, 2010 to provide Debt Adjustment services for a fee.

206.

PFSI Defendants, Defendant Dakich and Defendant Whitehead collectively received monies in the form of fees, charges, contributions or combinations thereof from Plaintiffs at the time said Agreements were entered into.

207.

None of the aforementioned funds paid by Plaintiffs were ever distributed to any of Plaintiffs' creditors, thus resulting in a 100% fee paid to Defendants for its Debt Adjustment services.

208.

Defendants, however, paid themselves all of their own fees each and every month without exception for the entire period in which Plaintiffs participated in Defendants' DSP.

209.

PFSI Defendants collectively continued to accept monies from the Plaintiffs as fees, charges, contributions or combinations thereof in an amount in excess of 7.5% of the total paid

monthly by Plaintiffs to Defendants for distribution to Plaintiffs' creditors until Plaintiffs terminated their relationship with Defendants.

210.

Said fees are contrary to the purpose of said legislation, as set forth in the enabling clause of House Bill 385, "to limit the maximum charge that may be imposed for the provision of debt adjustment services."  2003 Ga. Laws No. 103 p. 392 (H.B. 385).

211.

Defendants have collected similar fees in excess of the 7.5% cap from all other Georgia residents similarly situated to Plaintiffs.

212.

Defendants have violated the Debt Adjustment Act in the same manner with all other Georgia residents that have done business with Defendants since July 1, 2003.

213.

Plaintiffs/Plaintiff Class Members' claims against the Defendants are based on their general practice of soliciting Georgia residents and accepting from them, either directly or indirectly, a standard charge, fee, contribution, or combination thereof in violation of OCGA § 18-5-2.

214.

The Defendants knowingly conspired and actively engaged in the operation of a debt adjustment program as a routine and standard practice that did not significantly vary among members of the proposed Plaintiff Class.

215.

The actions of the Defendants combined and concurred to form a cohesive operation that violated the provisions of the Georgia Debt Adjustment Act.

216.

The claims of the Plaintiffs and Plaintiff Class Members are meritorious.  The named Plaintiffs believe they will prevail on the merits based upon the clear, unambiguous statutory provisions.

**COUNT II – Breach of Fiduciary Duty**

217.

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully restated herein and further state as follows:

218.

The Defendants represented to Plaintiffs and Plaintiff Class Members that the Defendants would provide sophisticated debt settlement services in negotiating a resolution of the Plaintiffs' debts based on a track record of obtaining similar results for other clients.

219.

The Defendants represented to the Plaintiffs and Plaintiff Class Members through standard written documentation that the Defendants would handle all of the Plaintiffs' credit obligations.

220.

By the use of the word "trust" in their enrollment documents and the creation of the alleged "Enrolled Members Trust" account wherein Defendants deposited Plaintiffs' and the putative class members' funds, Defendants created a fiduciary duty for themselves to properly adhere to the strictures of the GDAA.

221.

The Preamble of the Enrolled Members Trust states, in relevant part, the following:

> THIS TRUST AGREEMENT CREATES A TRUST
> RELATIONSHIP DESIGNED TO COLLECT, HOLD,
> SAFEGUARD, PROTECT, DISTRIBUTE AND PRUDENTLY
> INVEST ALL THE FUNDS DELIVERED TO THIS TRUST,
> ALL IN STRICT ACCORD WITH THE TERMS OF THIS
> TRUST AGREEMENT AND ALL APPLICABLE LAWS,
> RULES AND REGULATIONS.
>
> . . .
>
> THIS TRUST COMPELS THE BACK OFFICE SERVICE
> PROVIDER TO USE ITS BEST EFFORTS TO ASSIST THE
> TRUSTEE WITH COMPLIANCE WITH ALL APPLICABLE
> FEDERAL, STATE AND LOCAL LAWS.

Exhibit A, attached hereto.

222.

The Enrolled Members Trust was drafted by Defendant Dakich and executed by Defendant Brooks. Id.

223.

The trust corpus is controlled by the PFSI Defendants.

224.

Based upon the representations made by the Defendants, the Defendants had a fiduciary duty to the Plaintiffs and Plaintiff Class Members to act in their best interest and to provide competent advice regarding the restructuring of the Plaintiffs' credit obligations.

225.

The Defendants breached their fiduciary duty by failing to comply with the Georgia Debt Adjustment Act, by misrepresenting the willingness of creditors to resolve class member debt through debt settlement, by misrepresenting the ability of the Defendants to resolve class

member debts, by failing to secure agreements with the creditors of the class members to resolve their debts and by performing no service of value for the fees the Defendants received.

226.

Plaintiffs, individually and as class representative for all others similarly situated, seek as damages an amount equal to the total of all charges, fees, contributions, or combinations thereof paid by the Plaintiffs and all class members, plus $5,000 per class member, and any other sums as allowed under the law or in equity.

**COUNT IV-Negligent Misrepresentation**

227.

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully restated herein and further states as follows:

228.

The PFSI Defendants promoted themselves by way of advertising and promotional materials disseminated throughout Georgia and by way of their website, which was accessible throughout Georgia.   Through this advertising, the Defendants made unintentional false representations to Plaintiffs and Plaintiff Class Members.

229.

The PFSI Defendants negligently represented to Plaintiffs and Plaintiff Class Members that by enrolling in the Defendants' debt settlement program, Plaintiffs and Plaintiff Class Members would become debt-free.  This representation was false and misleading as few, if any, enrollees ultimately became debt-free.

230.

The PFSI Defendants promoted themselves on their website as "an attorney driven debt compromise program" which "is among the most successful in the country, and by assessing No

Up-Front fees you are able to participate with absolutely no risk." These statements are false and misleading because Defendants' debt settlement program is not successful. In fact, very few if any of the participants in the Defendants' program are successful in getting their debt settled. Moreover, despite their representations, the Defendants' debt settlement program carries many risks for the enrollee, including the possibility of suit by creditors and damage to credit.

231.

Defendants negligently misrepresented their ability to resolve consumer debts under their program, knowing that the probability of successful completion of the program by residents of the state of Georgia is virtually nonexistent.

232.

Despite CCR's advertisements on its website that the customers would "graduate debt free" from the debt adjustment "program," Defendant Wilson testified that in actuality the goal was not to help individuals become debt free, but rather that PFSI had morphed into a program that allowed customers to manage their debts on their own. Doc. 65, p. 8.

233.

Defendant Brooks testified that it was his intent that the CCR website and its advertising would reach potential customers in Georgia and invoke them to enter into agreements with PFSI. Doc. 35, p. 145.

234.

Defendants Dakich, Whitehead, Pearson and Taylor furthered the negligent misrepresentations by attempting to give the appearance that attorneys were running the debt negotiations, when in fact it was the non-attorney employees of PFSI that would negotiate, if at all, with their customers' creditors.

235.

Plaintiffs and Plaintiff Class Members relied on the representations made by PFSI Defendants in their advertising and promotional materials.  Once Plaintiffs and Plaintiff Class Members saw the advertising and understood the representations to be accurate, they contacted PFSI Defendants and enrolled in their debt settlement program.  As a result of their reliance on the PFSI Defendants' representations, Plaintiffs and Plaintiff Class Members were injured as set forth herein.

**WHEREFORE**, Plaintiffs being entitled to a trial by jury and judgment against the Defendants, pray for the following:

a)  An order certifying that the action may be maintained as a class action;

b)  That the named Plaintiffs herein be designated class representatives for the Plaintiff Class Members;

c)  That Plaintiffs' counsel of record herein be designated as class counsel for the Plaintiff Class Members class as defined in this complaint or by this court;

d)  Compensatory damages in an amount to be proven at trial, including any damages provided by statute;

e)  A temporary, preliminary and/or permanent order enjoining Defendants from continuing to charge fees in excess of those permitted by OCGA § 18-5-2;

f)  A temporary, preliminary and/or permanent order disgorging the Defendants of all money collected, freezing their assets, and required the Defendants to pay damages to the Plaintiff Class Members as required by OCGA § 18-5-4;

g)  An order granting Plaintiffs their expenses incurred in bringing and prosecuting this action, including attorney fees, expert fees and costs;

h)  Pre- and post-judgment interest, if applicable;

i)  That the Defendants be required to pay all monies referred to herein which relate to the Plaintiff Class Members into a common fund for the benefit of the Plaintiff Class Members, less an incentive award, litigation expenses and attorneys' fees;

j)  That the court conduct a "fairness hearing," after due and proper notice to all Plaintiff Class Members, and make such award of attorneys' fees, litigation expenses and an incentive award for the named Plaintiffs as the Court deems appropriate from the common funds (as reference above) and/or from the Defendants;

k)  A trial by jury; and

l)  Such other and further relief as the Court may deem just, necessary or appropriate.

Respectfully submitted, this 9th day of December, 2013.

**HURT STOLZ, P.C.**

 s/  James W. Hurt, Jr.
James W. Hurt, Jr.
Georgia Bar No.  380104

345 West Hancock Avenue
Athens, Georgia 30601
(706) 395-2750
Facsimile:  (866) 766-9245
jhurt@hurtstolz.com

**CORY, WATSON, CROWDER & DEGARIS, PC**

George Richard DiGiorgio
Alabama Bar No.: ASB-0289-R72G
F. Jerome Tapley
Alabama Bar No.: ASB-0583-A56T
Jon C. Conlin
Alabama Bar No.: ASB-7024-J66C

2131 Magnolia Avenue
Birmingham, AL 35205
Telephone: (205) 328-2200
Facsimile: (205) 324-7896
rdigiorgio@cwcd.com
jtapley@cwcd.com

**Admitted Pro Hac Vice**

**HULL BARRETT, P.C.**

David E. Hudson
Georgia Bar No. 374450
Christopher A. Cosper
Georgia Bar No. 142020
Christopher J. Driver
Georgia Bar No. 230803

Post Office Box 1564
Augusta, Georgia 30903-1564
Telephone: (706) 722-4481
Facsimile: (706) 722-9779
ccosper@hullbarrett.com
dhudson@hullbarrett.com
cdriver@hullbarrett.com

**CLARK & SMITH LAW FIRM, LLC**

John Christopher Clark
Georgia Bar No. 127353

3402 Vineville Avenue, Suite A
Macon, Georgia 31204
Telephone:  (478) 254-5040
Facsimile:  (478) 254-5041
chris@clarksmithlaw.com

**ATTORNEYS FOR PLAINTIFFS
AND PLAINTIFF CLASS MEMBERS**

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that I have this day served all counsel of record in the foregoing matter with a copy of *Plaintiffs' Fourth Amended Complaint* by electronically filing a copy of same with the Clerk of Court using the CM/ECF system, which will send notification to the following parties:

David A. Lester
**JONES WALKER LLP**
1819 Fifth Avenue N.
Suite 1100
Birmingham, AL  35203
Telephone: (205) 244-5283
Facsimile:  (205) 244-5483
dlester@joneswalker.com

William E. Raney
**COPILEVITZ & CANTER, LLC**
310 West 20th Street, Suite 300
Kansas City, MO  64108
Telephone:  (816) 472-9000
Facsimile:  (816) 472-5000
braney@cckc-law.com

James W. Davis
143 Lamar Street
Macon, GA  31204
Telephone: (478) 742-1440
Facsimile:  (478) 742-6419
jdavis@jameswdavislaw.com

Respectfully submitted, this 9th day of December, 2013.

**HURT STOLZ, P.C.**

 s/  James W. Hurt, Jr.
James W. Hurt, Jr.
Georgia Bar No.  380104

345 West Hancock Avenue
Athens, Georgia 30601
(706) 395-2750
Facsimile:  (866) 766-9245
jhurt@hurtstolz.com                 **ATTORNEY FOR PLAINTIFFS**